UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ROGER BRANSTETTER**,                          Civil Case No. 3:12-CV-02328-KI

              Plaintiff,

                                  OPINION AND ORDER

              v.

**GENERAL PARTS DISTRIBUTION,
LLC, dba CARQUEST AUTO PARTS,
and JOHN LEIN,**

              Defendants.


      Benjamin Rosenthal
      1023 SW Yamhill Street, Suite 200
      Portland, Oregon  97205

           Attorney for Plaintiff


Page 1 - OPINION AND ORDER

Jean Ohman Back
Leora Coleman-Fire
Schwabe, Williamson & Wyatt, P.C.
Pacwest Center
1211 SW 5th Avenue, Suite 1900
Portland, Oregon  97204

      Attorneys for Defendants

KING, Judge:

Plaintiff Roger Branstetter had worked at the warehouse of defendant General Parts

Distribution LLC, dba Carquest Auto Parts ("General Parts"), for several years when he began

suffering health problems which required several doctor's appointments and some sick days.

When Branstetter informed his supervisor, defendant John Lein, that he had another doctor's

appointment that day, the two men argued.  Lein told Branstetter he was terminated that evening.

The company claims it terminated Branstetter because he threatened Lein; Branstetter contends

he was terminated for seeking family medical leave.  He alleges claims under the Family Medical

Leave Act ("FMLA"), the Oregon Family Leave Act ("OFLA"), for retaliation under

ORS 659A.030(1)(f)-(g), for unpaid overtime under the Fair Labor Standards Act ("FLSA"), for

unpaid wages in the form of unpaid tuition reimbursement under ORS 652.140, and for breach of

contract for the unpaid tuition reimbursement.[1]  Before the court is Defendants General Parts

Distribution, LLC and John Lein's Motion for Summary Judgment [28].  As explained below, I

grant summary judgment against all claims except the alleged violations of the FMLA and

OFLA.

---

[1] Branstetter's counsel confirmed at oral argument he would voluntarily dismiss the
claim for wrongful discharge and the wage claim and breach of contract claim for unpaid
bonuses.  Accordingly, the court grants summary judgment and dismisses these claims.

Page 2 - OPINION AND ORDER

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to point out the absence of any genuine dispute of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains a fact dispute to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Nicholson v. Hyannis Air Serv., Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (internal quotation omitted).

## PRELIMINARY EVIDENCE ISSUES

Defendants move to strike Exhibits 7, 8, 16, 17, and 18[2] from the Rosenthal Declaration, arguing that Rosenthal does not have the personal knowledge to authenticate the exhibits. Rosenthal, who is Branstetter's counsel, authenticated these exhibits by stating that Branstetter provided the documents in response to defendants' request for production. The documents are a VOTT Grievance Telephone Investigation Template, work absence requests from Branstetter's treating physician, the Educational Assistance Program Application, an unofficial transcript from Marylhurst College, and a Human Resources Transaction Form.

Documents can be authenticated without relying on personal knowledge if such knowledge is not essential to the authentication. Las Vegas Sands, LLC v. Nehme, 632 F.3d 526, 533 (9th Cir. 2011) (a letter from an attorney and its return receipt are properly authenticated by

---

[2] Defendants also move to strike Exhibit 19 but it was not attached to the Declaration.

examining the documents to see if they appear genuine). To authenticate a document without personal knowledge, a "proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is" and may rely on the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed. R. Evid. 901(b)(4).

These documents appear to be authentic. Most of them are documents either created by General Parts, such as the VOTT Grievance Telephone Investigation Template, or something Branstetter would have given General Parts, such as the work absence requests.[3] Defendants do not claim the documents are forgeries, they only argue the documents are not properly authenticated. I disagree, and I deny the motion to strike.

Defendants move to strike Exhibit 12 from the Rosenthal Declaration. They argue the exhibit is an excerpt from Branstetter's unemployment hearing and thus inadmissible under ORS 657.273(2). That statute prohibits the use as evidence in other civil proceedings of "the decisions, findings, conclusions, final orders and judgments that arise out of" hearings, review proceedings, and judicial review proceedings in contested claims for unemployment insurance. The exhibit, a transcript from the hearing, is not a document listed in the statute and cannot be struck for violating the statute.

Alternatively, defendants argue the exhibit contains hearsay to which no exception applies. I note the portion relied on is part of Kingen's prior sworn testimony from the unemployment hearing. It does not fall within the hearsay exception for former testimony in

---

[3] Additionally, as part of a surreply, Branstetter provided a declaration explaining the documents were in his possession and provided to defendants in response to discovery requests.

Rule 804(b)(1) or the exception for a witness's prior statement in Rule 801(d)(1) because

Kingen's unavailability, whether he is subject to cross-examination, and whether the statement is

inconsistent with the current testimony are issues for trial, not for a summary judgment motion.

Branstetter contends the statement is a party opponent admission which is excluded from

the definition of hearsay under Rule 801(d)(2). Kingen was a General Parts employee at the time

of the unemployment hearing and was testifying on behalf of the company. I agree with this

analysis and deny the request to strike Exhibit 12.

## FACTS

I.    <u>Branstetter's Job Duties</u>

Branstetter started working for General Parts in April 2007 in the warehouse manager

training program, with a starting salary of $40,000 a year and a title of Warehouse Manager

Trainee. People in this program rotate through each department of the warehouse working as a

Warehouse Supervisor, with the goal of eventually becoming a Warehouse Manager somewhere

in the country. When the program is complete, typically in two to four years, the employee is

relocated to fill a vacant Warehouse Manager position. On August 1, 2007, General Parts

removed Branstetter from the trainee program and made him a Warehouse Supervisor in charge

of the production department of the Portland Distribution Center Warehouse. The company

considered him part of General Parts management. The written job description for Warehouse

Supervisor states the position is exempt under the FLSA.

John Lein was the Warehouse Manager who supervised Branstetter. Every morning, Lein

would tell Branstetter what needed to get done that day, and Branstetter disbursed the tasks to the

Auto Parts Handlers ("APHs") under him to complete the work.  APHs are nonexempt workers who earn between $24,336 and $33,176 per year after one to three years tenure.

Branstetter moved between different parts of the warehouse over time, but he generally supervised ten to twelve APHs.  He could provide input to Lein on an employee's performance, including policy violations.  Lein gave Branstetter's input weight in making decisions on advancement and discipline.  Lein remembers one employee Branstetter recommended for discipline and two other instances during which he discussed employee evaluations with Branstetter for five to ten minutes.  Branstetter was responsible for making sure the APHs were following workplace safety rules.  He walked the floor of the warehouse to observe employees and to check on stock.  Branstetter was responsible for conducting annual warehouse inspections, along with all of management.  He attended manager meetings.  Branstetter's subordinates saw him spend a lot of time on the computer at the front of the warehouse.

Branstetter did not interview or select employees for hiring, did not recommend pay raises for the APHs, did not discipline APHs, could not allow them to leave work if they became ill, and did not address APHs' complaints.  He claims he never made a recommendation about hiring, firing, or promoting an employee.

Branstetter estimates he spent about ten percent of his time supervising the employees under his direction.  The rest of the time, he did manual labor, including picking parts, unloading pallets, and driving the forklift.

II.    Branstetter's Illness and Termination

Branstetter began to feel ill in late October 2010 and took two days off work.  He also was out sick on November 15, 17, 19, 23, 24, 25, and 26.  Branstetter discussed his medical condition with Lein, and the need to see a doctor, at least ten times.

On Monday, November 29, Branstetter's illness symptoms had worsened over the weekend.  He went into work to open the warehouse.  Branstetter's area was short-handed so Lein was also picking parts.  About 9:00 a.m., Branstetter told Lein he was sicker and was going to have to return to the doctor because he had been sick for over a month.  Branstetter did not think managers had to file FMLA paperwork, and he never told Lein expressly that he needed to take FMLA leave.

According to Branstetter, Lein threw his pen down on his desk, stormed out of his office, and told Branstetter that if he was to take any more time off, he would have to fill out FMLA paperwork.  Branstetter phoned his doctor's office, made an appointment for 10:00 a.m. that day, and went to find Lein to tell him about the appointment.  Lein told him to "get the f**k out of my face" and pointed his finger at him.  Rosenthal Decl. Ex. 7, at 2.  Branstetter told Lein to get the finger out of his face.  Lein asked if Branstetter was threatening him, and Branstetter responded he was if you mean by calling HR.  Lein repeated to "get the f**k out of my face."  Id. Branstetter walked away and worked on parts until he went to his doctor's appointment. Branstetter denies asking Lein if he wanted to go outside to settle the conversation.

Lein remembers the incident differently.  According to Lein, he looked visibly frustrated and told Branstetter something like, "Do what you need to do."  Lein Decl. ¶ 7.  Branstetter became visibly angry, raised his voice, and walked quickly toward Lein until his face was two

inches away from Lein's face, causing Lein to feel physically threatened. Lein told Branstetter to get out of his face, and Branstetter said they could go outside right now and settle this. Lein understood this to mean Branstetter wanted to physically fight him, so he asked if Branstetter intended to threaten him. Branstetter responded he did, and repeated that they could go outside and settle this. Lein ended the conversation, and Branstetter walked away.

Under either scenario, Branstetter left for the doctor's appointment. Immediately after Branstetter left, at approximately 10:00 a.m., Lein reported the incident to the Director of Operations Dale Morris and Vice President of Human Resources Susan Warmuth. He attempted to notify Divisional Human Resources Manager Jim Kingen at that time, but he was out of the office. At 2:27 p.m., Lein sent an email to Morris, Kingen, and Vice President of Distribution Center Operations Jerome Repak summarizing the incident:

> Dale & Jerry, Roger Branstetter and I got into a heated discussion this morning. We were discussing his recent attendance, sick days. I was a little angry that Roger had scheduled another doctor's appt. for this morning after being out sick all last week. Roger got into my face, and threatened to "take it outside[."] I obviously felt physically threatened, I told him the [sic] get out, and go to his appointment.
>
> . . . .
>
> We do not have room on our team for people who threaten physical harm when there is an altercation.
>
> Please let me know how to proceed.

Lein Decl. Ex. D.

Branstetter went to his doctor's appointment, then went home and called corporate Human Resources, the Voice of the Teammate line, to report the incident. He got through and reported his complaint to a woman who explained Branstetter needed to talk with someone else.

Page 8 - OPINION AND ORDER

At 4:00 or 5:00 p.m. that same day, Morris called Lein to tell him that he, Repak, and Kingen had a conference call and decided to terminate Branstetter because of his threatening behavior. These decisionmakers did not discuss the issue of a possible FMLA leave request and did not know Branstetter might qualify for an FMLA leave. They also did not know that Branstetter made a complaint about Lein on the Voice of the Teammate line.

Lein knew Branstetter had been out sick and had seen a doctor but he did not know the diagnosis or whether the condition or absences might qualify him for FMLA leave. At the time of this incident, Lein did not know that more than three consecutive sick days which also involved treatment of two or more times by a health care provider was a serious health condition warranting an FMLA leave. Kingen explained that as Branstetter's supervisor, if Lein knew Branstetter was out the qualifying number of days, Lein had an obligation to inform him of the need to invoke the FMLA process. Kingen also explained that as a supervisor, Branstetter would be knowledgeable about the FMLA process and would be able to do it himself.

About 7:00 p.m. that evening, Lein texted Branstetter and asked him to come to work the next day. Branstetter told him he was too ill to do so, and that he had filed a complaint with Human Resources. Lein then called Branstetter and told him he was terminated because of the way he handled the situation that morning. Branstetter stated he would be seeking counsel, and Lein started screaming, "Sue away, sue away." Branstetter Dep. 123.

Kingen interviewed Branstetter and Lein as part of an investigation he conducted after the termination. He concluded Lein was more credible and affirmed the termination in mid-December. When deposed, Kingen could not remember if Branstetter was suspended, rather than terminated, on November 29.

Page 9 - OPINION AND ORDER

## DISCUSSION

I.    <u>Family Medical Leave Act Claims</u>

Branstetter alleges General Parts violated the state and federal family medical leave acts when Lein argued with Branstetter and later fired him because Branstetter had another doctor's appointment that day.  General Parts moves for summary judgment dismissing the FMLA and OFLA claims for several reasons–the FMLA claim is untimely, Branstetter never asked for family leave, and Branstetter cannot prove he was terminated because he asked for family leave.

A.    <u>Timeliness of the FMLA Claim</u>

General Parts argues the FMLA claim is untimely because Branstetter did not file it within the two year statute of limitations.[4]

Branstetter was terminated on November 29, 2010 and filed this Complaint on December 26, 2012.  Thus, for the FMLA claim to be considered timely filed, Branstetter must fall within the three year statute of limitations for willful violations of the FMLA.  29 U.S.C. § 2617(c)(2).  General Parts contends Branstetter cannot establish the company acted willfully because no one at the company knew before the termination decision that Branstetter planned to ask for FMLA leave or was in a situation which could implicate FMLA leave.

Branstetter contends there is a factual issue on whether General Parts committed a willful violation of the FMLA.  He claims Lein's knowledge of his sick days and doctor's appointments would suggest the existence of an FMLA qualifying medical condition, as demonstrated by Lein's advice for Branstetter to file FMLA paperwork if he needed additional time for doctor's

---

[4]  Branstetter's OFLA claim is timely because he filed a BOLI complaint within a year of his termination and there is no dispute he filed this action within the limits imposed by BOLI's 90-day notice.  ORS 659A.875(1)-(2), 659A.820(2).

appointments.  Branstetter also argues the termination decisionmakers focused on his alleged

threatening behavior and ignored information Lein provided which suggested Branstetter might

have a serious health condition.

A few circuits have applied the Supreme Court's FLSA standard for willfulness to FMLA

claims.  Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 33-34 (1st Cir. 2003); Hanger v. Lake

Cnty., 390 F.3d 579, 583-84 (8th Cir. 2004).  I am persuaded by their analysis and will adopt it in

light of no Ninth Circuit ruling on the issue.  Thus, an employer acted willfully if "the employer

either knew or showed reckless disregard for the matter of whether its conduct was prohibited by

the statute."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677 (1988).  "If

an employer acts reasonably in determining its legal obligation, its action cannot be deemed

willful . . . .  If an employer acts unreasonably, but not recklessly, in determining its legal

obligation, then . . . it should not be . . . considered [willful.]"  Id. at 135 n.13.

According to Branstetter, Lein became angry and told him to fill out FMLA paperwork if

he needed more time off.  The General Parts employee handbook has a section on requesting

FMLA leave which defines a serious health condition as a period of incapacity of more than three

consecutive calendar days plus two or more treatments by a healthcare provider.  Lein was aware

of the amount of sick time Branstetter had taken in November and his previous doctor's

appointments.  They discussed Branstetter's as yet undiagnosed medical condition at least ten

times.  These facts are adequate to create a factual issue on whether the employer showed

reckless disregard for whether its conduct was prohibited by the FMLA.  A jury will have to

decide whether General Parts acted willfully, thus making the FMLA claim timely.  I deny the

motion for summary judgment against the FMLA claim which argued the claim is untimely.

B.    Merits of the Claims

General Parts argues Branstetter cannot establish essential elements of his FMLA and

OFLA claims because he never asked for family leave prior to his termination and he was

terminated for threatening Lein, not for seeking family leave.

General Parts contends the fact that Branstetter had taken a few days of sick leave and

gone to a few doctor's appointments is insufficient to trigger a company's duty to inquire

whether family leave would apply.  It notes Branstetter had not even received a diagnosis for his

illness before the termination decision was made.

Branstetter argues he had several conversations with Lein about his health condition.

Combined with the week he took off work for illness, and the fact that a doctor's appointment

sparked the dispute on November 29, Branstetter claims Lein had knowledge of a condition

potentially qualifying for FMLA leave.

The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C.

§ 2615(a)(1).  This provision is violated "by engaging in activity that tends to chill an employee's

freedom to exercise his [] rights."  Bachelder v. America West Airlines, Inc., 259 F.3d 1112,

1123 (9th Cir. 2001).  Examples of interference include denying leave, discouraging an employee

from using leave, interfering with the length or dates of leave, mischaracterizing FMLA leave as

personal leave, and using the taking of leave as a negative factor in employment actions

including termination.  Xin Liu v. Amway Corp., 347 F.3d 1125, 1133-34 (9th Cir. 2003).  To

prevail on an FMLA interference claim resulting in termination, a plaintiff "need only prove by a

preponderance of the evidence that . . . taking of FMLA-protected leave constituted a negative

factor" "at all" in an employment decision.  Bachelder, 259 F.3d at 1125, 1131 (explaining why

McDonnell Douglas burden shifting approach would not be used).  An employer's intent is

irrelevant to a determination of liability in an interference claim.  Sanders v. City of Newport,

657 F.3d 772, 778 (9th Cir. 2011).

The OFLA is to be construed to the extent possible in a manner consistent with any

similar provisions of the FMLA.  ORS 659A.186(2).  Thus, OFLA interference claims should be

construed similarly to FMLA interference claims.  Sanders, 657 F.3d at 783.

The threshold issue here is whether Lein had sufficient information to be put on notice

the FMLA might apply to Branstetter.

Once an employee requests leave, it is the employer's responsibility to determine if the

leave is protected by the FMLA and notifying the employee accordingly.  Xin Liu, 347 F.3d at

1134.  The employee is not required to expressly assert rights under the FMLA or even mention

the Act.  If necessary, the employer may inquire further to make the determination.  Id.

> An employee shall provide at least verbal notice sufficient to make the
> employer aware that the employee needs FMLA-qualifying leave, and the
> anticipated timing and duration of the leave.  Depending on the situation, such
> information may include that a condition renders the employee unable to perform
> the functions of the job . . . .

29 C.F.R. § 825.302(c).

Because of the circumstances of this case, the issue of willfulness is similar to the issue of

notice.  Lein was aware of the amount of sick time Branstetter had taken in November and his

previous doctor's appointments.  They discussed Branstetter's as yet undiagnosed medical

condition at least ten times.  These facts are adequate to create a factual issue on whether

Branstetter provided Lein sufficient information to put him on notice the FMLA might apply to the time off work.

Alternatively, General Parts argues there is no evidence Branstetter was terminated for seeking family leave. The company insists it terminated Branstetter because he threatened Lein.

According to Branstetter, there is evidence Lein was frustrated with Branstetter's request to go to another doctor's appointment when the warehouse was short-staffed, and the company did not follow its internal investigation procedure prior to the termination. Considered with the questions on what happened during the dispute, Branstetter contends there is a factual issue on the reason for the termination.

I agree with Branstetter. Under his version of the facts, Lein immediately became angry when Branstetter mentioned the need to leave for another doctor's appointment. He then told Branstetter to fill out FMLA paperwork if he needed more time off. Lein's email to Morris, Kingen, and Repak explained Lein was angry because Branstetter scheduled another doctor's appointment after being out sick the entire last week. The decision to fire Lein was made a few hours later. There is a factual issue on whether Branstetter was fired because of the argument with Lein or because he needed to take leave or both. Consequently, I deny the motion for summary judgment against the FMLA and OFLA claims.

II.    Retaliation Claims under ORS 659A.030(1)(f)-(g)

Branstetter alleges Lein acted illegally by becoming irate and harassing Branstetter when he asked for time to go to a doctor's appointment on November 29. He opposed the illegality by complaining about Lein to the General Parts Voice of the Teammate hotline on November 29.

Page 14 - OPINION AND ORDER

Branstetter alleges defendants terminated him for resisting, opposing, and reporting Lein's illegal behavior, in violation of ORS 659A.030(1)(f)-(g), which makes it an unlawful employment practice:

> (f)  For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so.

> (g)  For any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so.

General Parts insists it terminated Branstetter for threatening Lein.  Thus, it argues Branstetter cannot prove causation between his opposition to Lein's behavior and his termination.  Specifically, General Parts contends Morris, Repak, and Kingen did not know of Branstetter's hotline report when they made the decision to terminate him.

Branstetter contends he was fired after he contacted Human Resources and within hours of his confrontation with Lien.  He also argues his termination did not conform to General Parts' policy requiring an investigation by Human Resources prior to a termination, and Kingen ignored FMLA issues in his post-termination investigation.  Even though Lien was not the decisionmaker, Branstetter claims Lien's annoyance with a possible FMLA-protected leave influenced the decisionmakers towards violating the statute.

In discrimination cases under Oregon law, Title VII cases are instructive on the analysis to be used.  Harris v. Pameco Corp., 170 Or. App. 164, 176, 954 P.2d 8048 (2000); Portland State Univ. Chapter of the Am. Ass'n of Univ. Professors v. Portland State Univ., 352 Or. 697, 667, 291 P.3d 658 (2012) (same for antiretaliation provision in ORS 659A.030(1)(f)).

In a Title VII retaliation claim, a plaintiff can prove a prima facie case by establishing the following factors:  (1) involvement in a protected activity; (2) an adverse employment action; and (3) a causal link between the activity and the employment action.  The causal link can be inferred from circumstantial evidence, such as the proximity in time between the protected activity and the retaliatory employment decision.  Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1069 (9th Cir. 2003) (only nine days lapsed between complaint and termination).

Here, the dispute between Branstetter and Lein began about 9:00 a.m. on November 29. Lein reported the incident to Morris by 10:00 a.m. and sent the email seeking Branstetter's termination to Morris, Kingen, and Repak at 2:27 p.m.  Branstetter made his complaint on the Voice of the Teammate line at some point after he returned home from the 10:00 a.m. doctor's appointment.  At 4:00 or 5:00 p.m. that same day, Morris called Lein to tell him that he, Repak, and Kingen had decided to terminate Branstetter.  There is no evidence any of the three decisionmakers had heard of Branstetter's telephone complaint.  There is also no evidence Lein had heard of the complaint; thus, there is no way he could have influenced the decisionmakers to terminate Branstetter in retaliation for it.

I realize temporal proximity is circumstantial evidence of a causal link, but here, the time lapse is too short to make the inference without another shred of evidence.  The complaint would have to make it through the corporate bureaucracy to the decisionmakers in less than four hours. I am unwilling to make that inference.  The actual Voice of the Teammate Grievance Telephone Investigation Template is dated December 1, at 4:05 p.m.  It states Branstetter first contacted Leave Administration to discuss an FMLA leave and was instructed to speak with Voice of the Teammate.  His call was transferred there and he left a voicemail message.  This is the call

Branstetter made on return home from the doctor's appointment.  I am willing to assume

Branstetter left sufficient details in the voicemail message to actually lodge a complaint, but I am

unwilling to infer that this early complaint, which was not fleshed out until December 1, was

communicated to the decisionmakers in less than four hours.  By then, the decisionmakers had

informed Lein they wanted to terminate Branstetter.

Consequently, Branstetter has not raised a factual issue that he was terminated in

retaliation for reporting Lein's illegal behavior.  I grant summary judgment and dismiss the

retaliation claims under ORS 659A.030(1)(f)-(g).

III.    <u>FLSA Overtime Claim</u>

Branstetter alleges a claim for unpaid overtime, in violation of the FLSA, for the period

from April 2, 2007 through November 29, 2010.  General Parts contends the claim fails because

it is time-barred and, in any case, Branstetter is an exempt employee who is not entitled to

overtime.

I will first determine whether Branstetter falls within the executive exemption and is not

entitled to overtime.

It is undisputed Branstetter was paid on a salary basis enough to satisfy the compensation

element of the exemption.  He earned $40,000 a year when hired in 2007 and $41,200 a year

when he was terminated.  In comparison, a new APH earned just over $24,000 a year.

General Parts contends Branstetter regularly directed the work of two or more APHs in

the warehouse, that his primary duty was managing the production department of the warehouse,

and that his recommendations on hiring, firing, advancement, or discipline of subordinates were

given particular weight. The company argues his non-managerial tasks do not disqualify Branstetter from the executive exemption.

Branstetter notes his two-to-four year management trainee program was ended after only four months, and General Parts changed his position from the trainee program to a warehouse supervisor without giving him additional responsibilities. He argues his primary duties were nearly all production-oriented, not managerial, and he had little input on personnel decisions. Branstetter characterizes his position as a mindless appendage to Lien, the Warehouse Manager.

FLSA exemptions are narrowly construed. The employer has the burden of showing an exemption applies by establishing an employee satisfies each criteria in the regulations. Christopher v. SmithKline Beecham Corp., 635 F.3d 383, 391 (9th Cir. 2011), aff'd, 132 S. Ct. 2156 (2012). The issue of how an employee spends his day is a factual question, but whether an employee's activities fall within an overtime exemption is a question of law. Id. Here, I see no dispute over what Branstetter does each day, so I can determine as a matter of law whether the exemption applies.

In addition to the salary basis criteria, which is undisputed here, the executive exemption covers any employee:

> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

> (3) Who customarily and regularly directs the work of two or more other employees; and

> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

Page 18 - OPINION AND ORDER

29 C.F.R. § 541.100(a).

Thus, the first criteria to address is whether Branstetter's primary duty is management.

Regulations define the terms:

> (a)  To qualify for exemption under this part, an employee's "primary
> duty" must be the performance of exempt work.  The term "primary duty" means
> the principal, main, major or most important duty that the employee performs.
> Determination of an employee's primary duty must be based on all the facts in a
> particular case, with the major emphasis on the character of the employee's job as
> a whole.  Factors to consider when determining the primary duty of an employee
> include, but are not limited to, the relative importance of the exempt duties as
> compared with other types of duties; the amount of time spent performing exempt
> work; the employee's relative freedom from direct supervision; and the
> relationship between the employee's salary and the wages paid to other employees
> for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700.  The performance of nonexempt work does not disqualify an employee

from the executive exemption if the requirements of 29 C.F.R. § 541.100 are met.  29 C.F.R.

§ 541.106(a).  An exempt employee can even spend less than 50 percent of his time performing

nonexempt duties.  29 C.F.R. § 541.700(b).

> Generally, "management" includes, but is not limited to, activities such as
> interviewing, selecting, and training of employees; setting and adjusting their rates
> of pay and hours of work; directing the work of employees; maintaining
> production or sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of recommending
> promotions or other changes in status; handling employee complaints and
> grievances; disciplining employees; planning the work; determining the
> techniques to be used; apportioning the work among the employees; determining
> the type of materials, supplies, machinery, equipment or tools to be used or
> merchandise to be bought, stocked and sold; controlling the flow and distribution
> of materials or merchandise and supplies; providing for the safety and security of
> the employees or the property; planning and controlling the budget; and
> monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Branstetter was paid significantly more than the employees he supervised, even when he first began the job.  He spent only about ten percent of his time performing management duties, including apportioning the work of employees, providing for the safety and security of employees and the property, controlling the flow of materials, and attending management meetings.  Ninety percent of the time, he performed the same nonexempt work as did the employees he supervised, such as picking parts.  This situation is similar to that of the store manager in In re Family Dollar FLSA Litigation, 637 F.3d 508 (4th Cir. 2011).  Although the store manager devoted 99 percent of her time to nonexempt tasks, "her job required that she 'multi-task,' such that while she performed nonmanagerial tasks, she was also functioning as a manager, which required that she watch out for possible theft by customers, train other employees, and perform other managerial tasks."  Id. at 511.  The court found the store manager fell within the executive exemption because she was the person responsible for running the store, even when multi-tasking her nonexempt duties.  Id. at 515-17.

I acknowledge Branstetter was supervised more directly by Lein than the Family Dollar store manager was supervised by her district manager, but I conclude his primary duty was management.  The most important factors are Branstetter's apportionment of work duties every morning, the number of employees he routinely supervised, the salary differential, and the fact that employees with problems came to him first, even though he often sent them along to Lein to resolve the problem.  I conclude his duties meet the second criteria in the regulations.

Branstetter customarily and regularly directed the work of two or more APHs when he disbursed tasks to them every morning.  It is significant that he typically directed the work of ten to twelve employees, rather than only two.  I conclude his duties meet the third criteria.

Turning to the fourth criteria, Branstetter did not have the authority to hire or fire so the question becomes whether the company gave his personnel recommendations particular weight.

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105.

The written job description for Warehouse Supervisor states the job duties include monitoring employee attendance, productivity, and other performance markers. Lein gave Branstetter's input weight in making decisions on advancement and discipline. Branstetter recommended one employee for discipline and the men discussed two employee evaluations for five to ten minutes. Branstetter never interviewed prospective employees.

Although the question is much closer, I also conclude Branstetter's duties meet the fourth criteria. He made occasional recommendations to Lein, plus the duty is included in the position's job description.

In sum, General Parts has established Branstetter meets all four criteria for the executive exemption. Thus, he is not entitled to overtime pay, and I grant summary judgment and dismiss the FLSA overtime claim.

IV.    Tuition Reimbursement Claims

Branstetter alleges General Parts agreed to reimburse 50% of his tuition costs for

obtaining his MBA degree.  To recoup the unpaid reimbursement, he alleges a claim for unpaid

wages at the termination of employment, in violation of ORS 652.140, and an alternative claim

for breach of contract.

A.    Breach of Contract

General Parts contends there is no contract to reimburse Branstetter for any part of his

MBA program tuition because his situation does not fit within the Educational Assistance

Program terms.  In particular, an MBA was not necessary to perform Branstetter's job or other

jobs to which he could advance.  Moreover, any comments by Dale Morris promising

reimbursement for MBA tuition costs could not create a contract because the comments were

unauthorized, were not supported by consideration from Branstetter, and Morris was neither

Branstetter's supervisor nor a human resources manager, the two positions which approve

reimbursements under the Educational Assistance Program.

Branstetter claims he enrolled in the MBA classes in reliance on Morris's confirmation

that reimbursement would occur as long as the classes were job-related.  He contends Morris had

apparent authority, as a supervisor, to approve the classes.  Branstetter also argues the deciding

factor is the content of the course and not the degree program.

General Parts has a written explanation of its Educational Assistance Program which lists

several criteria for approval of reimbursement, including "[c]ourses must be related to your

current job responsibilities or to a job for which you can reasonably expect to be considered in

the near future" and "[t]he application must be completed and approved prior to enrollment."

Morris Decl. Ex. D.  The procedure for application requires the employee to complete an application form and have his immediate supervisor and human resources manager sign the form to indicate approval.

Branstetter filled out an application but did not get it signed by the appropriate managers, as indicated on the form, or even by any other managers.  He claims he spoke to Morris about the MBA program and Morris told him that as long as it was job-related education expenses, General Parts would cover it.  Morris claims he never promised Branstetter he would be reimbursed for the MBA tuition costs.  Morris also states Branstetter's position, or other positions to which he could advance, did not require a Master's degree.  Morris is unaware of any General Parts' management-level employees who have a Master's degree.

Branstetter did not perform his end of the tuition reimbursement contract, the terms of which are clearly stated in the Educational Assistance Program, when he did not obtain the two approval signatures of his immediate supervisor and the human resources manager prior to enrollment in the class.  Lein is Branstetter's immediate supervisor, not Morris.  Even if Morris had the apparent authority to change the terms of the contract, he did not sign the application in approval.  Whether the particular classes were sufficiently related to Branstetter's job to be reimbursable is not relevant–Branstetter did not receive prior approval.  Consequently, I grant summary judgment and dismiss his breach of contract claim.

    B.    <u>Unpaid Wages</u>

General Parts argues the claim for unpaid wages, based on the unpaid tuition reimbursement, fails because tuition reimbursement does not constitute wages under Oregon law.

Branstetter argues Oregon uses a broad definition for the term wages which can include benefits.

As explained above, Branstetter was not entitled to the tuition reimbursement. Thus, whether it falls within the definition of wages unpaid at termination is moot. I grant summary judgment and dismiss his claim for unpaid wages under ORS 652.140.

## CONCLUSION

Defendants General Parts Distribution, LLC and John Lein's Motion for Summary Judgment [28] is granted in part. I dismiss the claim for wrongful discharge, the wage claim and breach of contract claim for unpaid bonuses under the FLSA and for tuition reimbursement, the FLSA overtime claim, and the ORS 659A.030(f)-(g) retaliation claims. The FMLA and OFLA claims remain for trial.

IT IS SO ORDERED.

Dated this _____19th_____ day of December, 2013.


    _/s/ Garr M. King_____
    Garr M. King
    United States District Judge

Page 24 - OPINION AND ORDER